# STATE OF CONNECTICUT *v.* JAMES HIGGS

INGLIS, C. J., BALDWIN, O'SULLIVAN, DALY and BORDON, Js.

Argued December 7, 1955—decided January 24, 1956

*Jack Greenberg* of the New York bar and *Peter Marcuse,* with whom, on the brief, were *Thurgood Marshall* of the Maryland bar and *Constance B. Motley* of the New York bar, for the appellant (defendant).

*Lorin W. Willis,* state's attorney, for the appellee (state).

INGLIS, C. J. On a trial to the jury, the defendant was found guilty of rape. From the judgment rendered on that verdict he has appealed. His assignments of error are numerous but can be grouped in five categories. He claims error, first, in the court's refusal to allow questions on the voir dire concerning possible race prejudice on the part of prospective jurors; second, in various rulings on evidence; third, in the denial of his motion for a mistrial; fourth, in the charge; and lastly, in the court's conduct, which he maintains was so prejudicial to him throughout the whole trial that it constituted a denial to him of due process of law. There is no merit to any of these claims of error except the first.

The defendant is a Negro. His alleged victim is a white woman. The printed record contains excerpts from the examination on the voir dire of six of the veniremen. To the first of these, the defendant's attorney propounded the question: "Would it require any less evidence for you to find a Negro person guilty of such a crime [rape] than it would to find a white person?" The court on its own motion ruled the question out, saying: "You can't make a distinction, you know, between the temperament and mentality of the white horses and the black horses."

To the second venireman, the following question was propounded: "Mrs. Herdeg, would you have any reluctance in following any instruction the Court may give you as to the weight which may be given to the fact that the defendant or any witness in this case is a Negro?" Thereupon the court said: "Now, what has that to do with it? Negroes stand before the Bar of Justice the same as white people. We make no distinction between colors in [either] the justice [or] the brand of justice which is given to one or the other." To the same prospective juror was put the question: "Mrs. Herdeg, would you have any prejudice against a defendant because of his color?" The court interjected: "Now, I have told you before it does not make any difference about his color. The question is whether or not any witness or any principal in the case is such that this witness would have a prejudice against them. The color does not enter into it." The defendant's attorney then said: "The color is a possible source of prejudice and I would like to inquire of the respective——" Thereupon the court interrupted to say: "The Court does not recognize any such thing. You can ask the questions proper to ask.

We recognize nobody as holding a prejudice against
a person because of his color . . . ."

The foregoing exchanges between the court and
counsel are typical of what occurred in the course
of the examination of the other veniremen. When-
ever counsel asked whether the prospective juror
had any prejudice against a Negro so that it would
require less evidence to convict him of the crime of
rape than it would to convict a white man, or asked
whether the juror would be less inclined to believe
a Negro witness than a white witness simply because
of the former's color, the court excluded the ques-
tion. It appears from the remarks made by the
court that its ruling was based upon the ground
that in a court of justice no distinction should be
made between Negroes and white persons and that,
therefore, the very thought that it was possible for
a juror to be so prejudiced against Negroes that he
would be less apt to believe their testimony than
that of white persons or require less evidence to con-
vict them should be carefully kept from the minds of
prospective jurors.

When this case was tried, § 7908 of the General
Statutes was in effect. It provided: "In any civil or
criminal action tried before a jury, either party may
examine each juror as to his qualifications to sit as a
juror in such action . . . ; and, if the judge before
whom such examination shall be held shall be of the
opinion from such examination that any juror would
be unable to render a fair and impartial verdict, such
juror shall be excused by the judge from any further
service upon the panel, or in such action, as such
judge may determine."

Under this statute, any party to a jury case had
an absolute right to examine prospective jurors on
the voir dire. The information elicited by such an ex-

amination serves a twofold purpose. In the first place, it permits the court to determine whether a venireman is qualified to act as a juror, and, in the second place, it aids each party in exercising his right to peremptory challenges. *Duffy* v. *Carroll,* 137 Conn. 51, 56, 75 A.2d 33. It is true that the extent to which parties may go in such an examination rests largely in the discretion of the court, and the exercise of that discretion will not constitute reversible error unless the discretion has been clearly abused and one of the parties has been prejudiced thereby. *Duffy* v. *Carroll,* supra; *Sherman* v. *William M. Ryan & Sons, Inc.,* 126 Conn. 574, 578, 13 A.2d 134; see *State* v. *Mendill,* 141 Conn. 360, 362, 106 A.2d 178. Nevertheless, in exercising its discretion, the court should grant such latitude as is reasonably necessary to fairly accomplish the purposes of the voir dire. Clearly, therefore, if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of the case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. Otherwise, the right of trial by an impartial jury guaranteed to him by article first, § 9, of the constitution of this state might well be impaired. See *State* v. *Potter,* 18 Conn. 166, 171; *State* v. *Wilson,* 38 Conn. 126, 137.

In line with this thought, it is almost uniformly held in other jurisdictions that it is reversible error in a criminal case in which a Negro is the defendant to exclude questions, propounded by him on the voir dire, designed to bring out that a prospective juror is so prejudiced against the Negro race that it would take less evidence to convince him that a Negro was guilty of the crime charged than to convince him

that a white person had committed a similar crime. *Aldridge* v. *United States,* 283 U.S. 308, 313, 51 S. Ct. 470, 75 L. Ed. 1054, 73 A.L.R.2d 1203 & note, 1208; *Pinder* v. *State,* 27 Fla. 370, 374, 8 So. 837; *Hill* v. *State,* 112 Miss. 260, 265, 72 So. 1003; *State* v. *McAfee,* 64 N.C. 339, 340; *Fendrick* v. *State,* 39 Tex. Crim. 147, 150, 45 S.W. 589; Busch, Law & Tactics in Jury Trials, § 119.

We cannot be blind to the fact that there may still be some who are biased against the Negro race and would be more easily convinced of a Negro's guilt of the crime of rape than they would of a white man's guilt. Especially would they be unlikely to approach in a detached and objective manner the decision of the guilt or innocence of a Negro charged with raping a white woman.

So long as race prejudice exists, even in a relatively few persons, there is a substantial chance that one of those few will appear in court as a venireman. Consequently, the fact that most people in the state are not prejudiced against Negroes is not of controlling importance. The point is clearly stated in *Aldridge* v. *United States,* supra, 314, as follows: "But the question is not as to the civil privileges of the negro, or as to the dominant sentiment of the community and the general absence of any disqualifying prejudice, but as to the bias of the particular jurors who are to try the accused. If in fact, sharing the general sentiment, they were found to be impartial, no harm would be done in permitting the question; but if any one of them was shown to entertain a prejudice which would preclude his rendering a fair verdict, a gross injustice would be perpetrated in allowing him to sit. Despite the privileges accorded to the negro, we do not think that it can be said that the possibility of such prejudice is so re-

mote as to justify the risk in forbidding the inquiry."

The statute, § 7908, entitled the defendant as a matter of right to examine each venireman on the voir dire as to his qualifications to serve as a juror. Whether or not a venireman harbored any prejudice against Negroes as a race had, under the circumstances of the case at bar, a very direct and peculiarly important bearing on his qualification to sit as a juror. It was of vital importance to the defendant that if any such prejudice existed it be brought to light. Only so could he intelligently challenge for cause or exercise his right of peremptory challenge. The rulings excluding from the examination on the voir dire all questions concerning race prejudice were an abuse of the court's discretion. Since they prevented the defendant from exercising his rights under the statute, they were prejudicial to him. Consequently, the rulings constitute reversible error.

The state contends that if the exclusion of questions designed to determine whether prospective jurors entertained race prejudice was error, it was harmless because the particular jurors, the examination of whom is set forth in the finding, were either excused by the defendant and did not sit or were accepted by the defendant. The answer to this is that by its repeated rulings excluding this line of questions and by its admonition of counsel, the court made it clear that it would not tolerate the propounding of such questions to any of the veniremen. Consequently, the defendant was precluded from following this line of inquiry with all of the jurors who were selected to serve.

The state also contends that the defendant waived any claim of error on this score. This contention is based upon the following: Mr. Pharr, senior counsel for the defendant, was not present in court

during the voir dire. The examination was conducted by Mr. Marcuse, the junior counsel. After the twelve jurors were selected but before they were sworn, Mr. Pharr arrived. The court said to him: "Now, in your absence, a jury has been accepted. We deferred swearing them until you could be here today. Personally, I don't think of any motion you might want to make, but if you want to make any, the way is still open." To this Mr. Pharr replied: "I have none to make. I am satisfied with the jury Mr. Marcuse has picked for us." It is obvious that at this stage of the proceeding there was no motion which Mr. Pharr could have made with any prospect of its being granted. He had no ground upon which to base a motion that any of the jurors be discharged because of race prejudice, because the rulings of the court had prevented the disclosure of such prejudice by any of the jurors who had been accepted. It was, moreover, perfectly clear from the attitude of the court that a motion for a re-examination of all of the jurors in order to inquire as to any race prejudice would have been futile. There was nothing left for Mr. Pharr to do but to continue the trial to the jury already selected. Under the circumstances, he was entitled to accept for the time being the rulings of the court in the expectation that he would assign them as error. The fact that he did accept those rulings and say that he was satisfied with the jury cannot reasonably be interpreted under the circumstances of this case as a waiver of any claim of error in the rulings.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.